UNITED STATES DISTRICT COURT

**SEALED FILED**

for the

**JAN 2 9 2019**

Eastern District of California

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

In the Matter of the Search of      )
                                     )
                                     )     Case No.
6587 Hahn Road                       )
Arbuckle, California                 )
                                     )     2: 1 9 - SW - 0 0 7 2 — KJN
                                     )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-1, attached hereto and incorporated by reference.**

located in the _____Eastern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Manufacture or Distribution of a Controlled Substance; |
| 21 U.S.C. § 846 | Conspiracy to Manufacture, to Distribute, and to PWI to Distribute a Controlled Substance |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☑ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Jason Chin
Drug Enforcement Administration
*Printed name and title*

Sworn to before me and signed in my presence.

Date: JAN 29, 2019

*Judge's signature*

City and state: Sacramento, California

Kendall J. Newman, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANT

I, Jason Chin, being duly sworn, hereby depose and state as follows:

## I.      INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent of the Drug Enforcement Administration (DEA) and have been so employed since May 2005. I am currently assigned to the DEA Sacramento District Office and am charged with investigating drug trafficking and money laundering activities in the Eastern District of California, and elsewhere. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations and make arrests for federal felony offenses. Additionally, I am a Federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a federal law enforcement agent engaged in enforcing criminal laws and authorized to request a search warrant.

2.      I was trained as a DEA Special Agent at the DEA Academy, Quantico, Virginia. During my training, I received special training in the Controlled Substance Act, Title 21 United States Code, including but not limited to, Sections 841(a)(1) and 846, Controlled Substance Violations and Conspiracy to Commit Controlled Substance Violations, respectively. I have received special training regarding criminal organizations engaged in conspiracies to manufacture and/or possess with intent to distribute methamphetamine, cocaine, cocaine base, heroin, marijuana, MDMA, and other dangerous drugs prohibited by law. I received further training in search and seizure law, financial investigations and money laundering techniques, and many other facets of drug law enforcement. I have also spoken to and worked with experienced federal, state, and municipal agents and narcotics officers regarding the methods and means employed by drug manufacturers and drug traffickers including the use of express carriers and the U.S. Postal system to distribute drugs.

3.      During the course of my employment as a DEA Special Agent, I have participated in numerous criminal investigations. I have participated in executing numerous Federal and State

1

search warrants involving the aforementioned listed controlled substances, the seizure of narcotics-related records and other types of evidence that document the activities of criminal organizations in both the manufacturing and distribution of controlled substances. To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance, various types of infiltration, including undercover agents, informants, and cooperating sources. Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I am familiar with the methods used by drug traffickers to smuggle and safeguard controlled substances, to distribute, manufacture, and transport controlled substances, and to collect and launder related proceeds.

## II.    PURPOSE

4.      The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter. Rather, I make this affidavit in support of an application for a warrant to search:

> **(1) 6587 Hahn Road, Arbuckle, California 95912 (hereafter referred to as the SUBJECT PROPERTY), further described in Attachment A-1;**

> **(2) a gray Ford F-150 bearing California license plate number 60857F2 and Vehicle Identification Number ("VIN") 1FTEW1EF0HFA34567 (hereafter referred to as SUBJECT VEHICLE), further described in Attachment A-2;**

> **the seizure of the items described in Attachment B;**

> **and,**

> **a criminal complaint naming ERIC WILLIAM JOHN FRICCERO.**

2

For violations of:

a.    Title 21 U.S.C. § 841(a)(1) (Manufacture or Distribution of a Controlled Substance);

b.    Title 21 U.S.C. § 846 (Conspiracy to Manufacture, to Distribute, and to Possess with Intent to Distribute a Controlled Substance).

## III.    OVERVIEW

5.    During this investigation, federal law enforcement officers have: (1) observed ERIC WILLIAM JOHN FRICCERO (hereinafter "FRICCERO") place parcels containing narcotics into the United States Postal Service ("USPS") mail system; (2) conducted two undercover purchases of marijuana from a dark web marketplace vendor believed to be controlled by FRICCERO; and (3) seized two parcels containing marijuana products that were mailed by FRICCERO. In doing so, FRICCERO is:

a.  Manufacturing and distributing controlled substances.

  i. Under 21 U.S.C. § 841(a)(1), "it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

b.  Conspiring to manufacture and distribute controlled substances.

  i. Under 21 U.S.C. § 846, "any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

## IV.    TECHNICAL BACKGROUND

6.    Digital currency (also known as crypto-currency) is generally defined as an electronic-

3

sourced unit of value that can be used as a substitute for fiat currency (i.e. currency created and regulated by a government.) Digital currency exists entirely on the Internet and is not stored in any physical form. Digital currency is not issued by any government, bank, or company and is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Digital currency is not illegal in the United States and may be used for legitimate financial transactions. However, digital currency is often used for conducting illegal transactions, such as the sale of controlled substances.

7. Bitcoin[1] is a type of digital currency. Bitcoin payments are recorded in a public ledger that is maintained by peer-to-peer verification and is thus not maintained by a single administrator or entity. Individuals can acquire Bitcoins either by "mining" or by purchasing Bitcoins from other individuals. An individual can "mine" for Bitcoins by allowing his/her computing power to verify and record the Bitcoin payments into a public ledger. Individuals are rewarded for this by being given newly created Bitcoins.

8. An individual can send and receive Bitcoins through peer-to-peer digital transactions or by using a third-party broker. Such transactions can be done on any type of computer, including laptop computers and smart phones.

9. Bitcoins can be stored in digital "wallets." A digital wallet essentially stores the access code that allows an individual to conduct Bitcoin transactions on the public ledger. To access Bitcoins on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key.") The public address can be analogized to an account number while the private key is like the password to access that account.

10. Even though the public addresses of those engaging in Bitcoin transactions are recorded on the public ledger, the true identities of the individuals or entities behind the public addresses are not recorded. If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity. Bitcoin transactions are, therefore, described as "pseudonymous," meaning they are partially anonymous.

---

[1] On January 25, 2019, one Bitcoin is equal to approximately \$3,563 USD

4

11.     Through the dark web or darknet, i.e. websites accessible only through encrypted means, individuals have established online marketplaces, such as the Silk Road, for narcotics and other illegal items.  These markets often only accept payment through digital currencies, such as Bitcoin.  Accordingly, a large amount of Bitcoin sales or purchases by an individual is often an indicator that the individual is involved in narcotics trafficking or the distribution of other illegal items.  Individuals intending to purchase illegal items on Silk Road-like websites need to purchase or barter for Bitcoins.  Further, individuals who have received Bitcoin as proceeds of illegal sales on Silk Road-like websites need to sell their Bitcoin to convert them to fiat (government-backed) currency.  Such purchases and sales are often facilitated by peer-to-peer Bitcoin exchangers who advertise their services on websites designed to facilitate such transactions.

12.     Dark web sites, such as Silk Road, AlphaBay, Wall Street, and Dream, operate on "The Onion Router" or "TOR" network. .The TOR network ("TOR") is a special network of computers on the Internet, distributed around the world, that is designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing the network, and, thereby, the locations and identities of the network's users.  TOR likewise enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, which are referred to as "hidden services" on the TOR network.  Such "hidden services" operating on TOR have complex web addresses, which are many times generated by a computer algorithm, ending in ".onion" and can only be accessed through specific web browser software designed to access the TOR network.

## V. FACTS ESTABLISHING PROBABLE CAUSE

### A.     Exploratory purchases of the NCIDE task force

13.     I am part of the Northern California Illicit Digital Economy (NCIDE) task force of Homeland Security Investigations ("HSI"), the Federal Bureau of Investigation ("FBI"), the Drug Enforcement Administration ("DEA") and the United States Postal Inspection Service

5

("USPIS"). As a function of this task force, investigators regularly purchase narcotics utilizing both digital and fiat currencies, from the persons operating and illegally selling narcotics on the "clear" portion of the internet, from the "dark" portion of the internet and from various social media platforms. Investigators conduct the undercover purchases of narcotics to assist in the effort to identify the suspects operating such illicit sites.

14.     In or about July 2018, the NCIDE task force opened a joint investigation of a Dream Market based vendor (hereafter "VENDOR-1") involved in shipping controlled substances via the USPS.

15.     VENDOR-1 joined the Dream marketplace on July 20, 2017 and offers marijuana products in various forms to include cartridges, distillates, shatter, crumble and marijuana buds up to multi-pound quantities. As of January 25, 2019, VENDOR-1 has 4,100 reviews with a rating of 4.91 out of 5 stars.

16.     VENDOR-1 posts on the Dread dark web forums and provides customer service support through the Dread dark web forum. During the course of this investigation, case agents have placed orders from VENDOR-1 on the Dream marketplace.

17.     On July 9, 2018, a FBI Special Agent placed an undercover purchase of a half-pound of marijuana from VENDOR-1 on the Dream Marketplace and had the parcel sent to a P.O. Box controlled by the USPIS located in another State. The undercover buy was conducted using Bitcoin as payment. On July 20, 2018, investigators opened the package purchased from VENDOR-1 and discovered suspected marijuana weighing approximately 261 grams including the packaging. The package bore the return address of "CHRISTIAN LONG 3423 DIXIELAND WAY RANCHO CORDOVA CA 95670-7333." The package was shipped on July 12, 2018 from the U.S. Post Office located at 1618 Alhambra Boulevard, Sacramento, California. An Internet search for open source records on address 3423 Dixieland Way, Rancho Cordova, California revealed that the address was a real physical address for a residence and returned an active for sale listing for the property.

6

18. On July 25, 2018, a FBI Special Agent placed a second undercover purchase of a quarter-pound of marijuana through VENDOR-1's Dream Marketplace vendor page and had the parcel sent to a P.O. Box controlled by the USPIS. On August 4, 2018, the parcel was delivered. An examination of the parcel label revealed a return address of "WALTER BERGMAN 4441 55TH ST SACRAMENTO CA 95820-4108." Upon opening the parcel, law enforcement officers found a vacuum sealed plastic bag containing approximately a quarter-pound of suspected marijuana. An Internet search for open source records on address 4441 55TH Street, Sacramento, California revealed that the address was a real physical address for a residence and returned an active for sale listing for the property, which was same method used for the return address on the July 9, 2018 undercover order.

### B. Shipper identification and surveillance

19. Based on the return label information and characteristics of the package from the July 9, 2018 undercover order, USPIS inspectors were able to determine through the analysis of U.S. Postal databases and surveillance camera footage that VENDOR-1 was mailing packages on a daily basis from the Sacramento area. Furthermore, the USPIS analysis revealed that the post offices located at 1015 Riley Street, Folsom, California (hereafter "Post Office #1") and 1618 Alhambra Boulevard, Sacramento, California (hereafter "Post Office #2") were frequently used by VENDOR-1 to mail packages. After conducting surveillances at Post Offices #1 and #2, law enforcement officers identified VENDOR-1 as FRICCERO.

20. On or about July 16, 2018, US Postal Inspectors discovered several suspected narcotics parcels associated to VENDOR-1 were mailed from Post Office #2. USPIS Inspectors noticed several anomalies that, based on their training and experience, are characteristics of parcels containing controlled substances. A search of theses parcels in USPS records and databases determined the label on the parcels was provided by "easypost" (an online postage provider), through a third party vendor that sells postage online and accepts Bitcoin as payment. US Postal Inspectors reviewed the surveillance video at Post Office #2 and subsequently determined FRICCERO mailed the parcels.

7



**Photo 1 – FRICCERO placing parcels on the counter of Post Office #2**

21.     On or about July 18, 2018, USPIS Inspectors discovered several suspected narcotics parcels associated to VENDOR-1 were mailed from Post Office #2.  Law enforcement noticed several anomalies that, based on their training and experience, are characteristics of parcels containing controlled substances.  A search of theses parcels in USPS records and databases determined the label on the parcels was provided by "easypost" (an online postage provider), through a third party vendor that sells postage online and accepts Bitcoin as payment. US Postal Inspectors reviewed the surveillance video at Post Office #2 and determined FRICCERO mailed the parcels.  The video surveillance revealed FRICCERO made three trips (10:15 a.m., 10:16 a.m. and 10:17 a.m.) into Post Office #2 and mailed the parcels inside the post office lobby drop box.  FRICCERO was also observed leaving Post Office #2 with USPS Priority small mail flat rate boxes.

8



**Photo 2 – FRICCERO entering Post Office #2**

22.    On or about July 19, 2018, US Postal Inspectors discovered several suspected narcotics parcels associated to VENDOR-1 were mailed from Post Office #2. Law enforcement noticed several anomalies that, based on their training and experience, are characteristics of parcels containing controlled substances. A search of theses parcels in USPS records and databases determined the label on the parcels was provided by "easypost" (an online postage provider), through a third party vendor that sells postage online and accepts Bitcoin as payment. US Postal Inspectors reviewed the surveillance video at Post Office #2 and determined FRICCERO mailed the parcels. The video surveillance revealed FRICCERO made two trips (9:13 a.m. and 9:14 a.m.) into Post Office #2 and mailed the parcels inside the post office lobby drop box. FRICCERO is also observed leaving Post Office #2 with USPS Priority small mail flat rate boxes.

9



**Photo 3 – FRICCERO entering Post Office #2**

23.     On or about July 23, 2018, US Postal Inspectors discovered several suspected narcotics parcels associated to VENDOR-1 were mailed from Post Office #2.  Law enforcement noticed several anomalies that, based on their training and experience, are characteristics of parcels containing controlled substances.  A search of theses parcels in USPS records and databases determined the label on the parcels was provided by "easypost" (an online postage provider), through a third party vendor that sells postage online and accepts Bitcoin as payment. US Postal Inspectors reviewed the surveillance video at Post Office #2 and determined FRICCERO mailed the parcels.  The video surveillance revealed FRICCERO made two trips (9:48 a.m. and 9:50 a.m.) into Post Office #2 and mailed the parcels.  At approximately 9:48 a.m., FRICCERO placed larger parcels on the counter at Post Office #2.  At approximately 9:50 a.m., FRICCERO mailed the parcels inside the post office lobby drop box.



**Photo 4 – FRICCERO placing parcels on the counter of POST OFFICE #2**

24.     On July 30, 2018, agents and inspectors with DEA, HSI, FBI and USPIS conducted
surveillance at Post Office #1. At approximately 9:58 a.m., an HSI agent observed FRICCERO
arrive at Post Office #1 in the SUBJECT VEHICLE and drop off approximately twelve
packages. At approximately 10:44 a.m., a USPIS inspector responded to Post Office #1, and was
able to locate eleven packages mailed by FRICCERO. The packages located by the USPIS
inspector were consistent in size, shape and color of the packages that FRICCERO dropped off at
Post Office #1. A review of the packages by the USPIS inspector revealed that each package
was shipped in a USPS flat rate small box. One of the parcels was detained (hereafter "Detained
Package #1") at Post Office #1 for further investigation. Detained Package #1 listed a return
address of "WALTER BERGMAN 4441 55TH ST SACRAMENTO CA 95820-4108."[2] A federal
search warrant was subsequently obtained for Detained Package #1, and upon opening the
package, agents discovered multiple vials of a liquid substance suspected to be
tetrahydrocannabinol (THC) extract. Based on my training and experience, I am aware that THC

---

[2] The return address of "WALTER BERGMAN 4441 55TH ST SACRAMENTO CA 95820-4108" used on Detained
Package#1 was the same return address listed on the package received following the July 25, 2018 undercover order
from VENDOR-1.

is the principal psychoactive drug in marijuana. Additionally, the vials were individually packaged in hard plastic packaging material and that were each branded "EMERALD BAY EXTRACTS."

25.     At approximately 10:37 a.m., I observed FRICCERO arrive at Post Office #2. FRICCERO exited the SUBJECT VEHICLE and carried a square shaped package into the post office before returning to his vehicle and retrieving seven additional small packages which he also carried into the post office. FRICCERO returned to his vehicle a second time and retrieved four more small packages, which he carried into Post Office #2. A USPIS Inspector responded to Post Office #2 and located the twelve packages dropped off by FRICCERO. The twelve packages were similar in size, shape and color to the packages that FRICCERO dropped off at Post Office #2 and utilized the same return addresses as the packages FRICCERO dropped off at Post Office #1 including the same return address listed on Detained Package #1.

26.     Agents and investigators maintained surveillance on FRICCERO after he departed Post Office #2. At approximately 12:27 p.m., agents and investigators observed FRICCERO arrive and turn into the SUBJECT PROPERTY. FRICCERO parked the SUBJECT VEHICLE in front of the garage located on the SUBJECT PROPERTY.

27.     An FBI surveillance team conducted surveillance at the SUBJECT PROPERTY on at least three occasions from August 17, 2018 through November 1, 2018. During the surveillances, the FBI surveillance team observed FRICCERO exit and enter the residence on the SUBJECT PROPERTY. Additionally, FRICCERO was observed driving to and from the SUBJECT PROPERTY in the SUBJECT VEHICLE.

28.     On December 17, 2018, law enforcement established surveillance near the SUBJECT PROPERTY and observed the SUBJECT VEHICLE parked at the SUBJECT PROPERTY. At approximately 10:27 a.m., the surveillance team observed FRICCERO in the SUBJECT VEHICLE drive away from the SUBJECT PROPERTY. Law enforcement established mobile surveillance on FRICCERO and followed FRICCERO to the U.S. Post Office located at 200 Prairie Court, Vacaville, California (hereafter "Post Office #3"). The surveillance team observed

12

FRICCERO exit the SUBJECT VEHICLE carrying approximately seven U.S. Postal small flat rate boxes. Law enforcement followed FRICCERO on foot after he entered Post Office #3. FRICCERO walked over to the parcel drop off area and exited the post office empty handed.

29.     Immediately after FRICCERO dropped the parcels on the post office counter and walked out of Post Office #3, one member of the surveillance team took custody of the seven parcels. USPIS Inspector Jason Bauwens responded to Post Office #3. Inspector Bauwens took custody of the seven parcels dropped off by FRICCERO, which were consistent with other parcels mailed by FRICCERO throughout this investigation. Out of the seven parcels mailed by FRICCERO, Inspector Bauwens detained one of the parcels (hereinafter "Detained Parcel #2) for further investigation and placed the remaining six back into the mail stream.

30.     An examination of Detained Parcel #2 revealed several of the same characteristics of the parcels previously mailed by FRICCERO. For example, a return address of "CHRIS WELLS 2987 PONDEROSA LN SACRAMENTO CA 95815-1025" was listed on Detained Parcel #2. An Internet search of "2987 PONDEROSA LN SACRAMENTO CA" revealed that the address was a real physical address for a residence currently listed for sale. The use of this return address was consistent with the return address used on the packages from the July 9 and 25, 2018 undercover orders and Detained Package #1 in that the return addresses were for homes currently listed for sale. Additionally, like Detained Package #1 and the packages dropped off by FRICCERO at various post offices that were reviewed by USPIS Inspectors, Detained Package #2 had a mailing label generated from "easypost."

31.     On December 27, 2018, a federal search warrant was executed on Detained Package #2. Upon opening the package, law enforcement officers discovered a plastic sealed bag containing ten vials filled with a liquid substance. The vials were individually packaged in paper/cardboard packaging and bore a label identifying the vials as "MEDICAL CANNABIS." Furthermore, some vials listed the names of cannabis strains including "GELATO" and "GG#4." On January 25, 2019, I reviewed the product listings on VENDOR-1's Dream Market vendor page. Included in the product listings were marijuana products available for sale with the "Gelato" and "GG4" strains.

13

32.     On January 25, 2019, I conducted a drive-by surveillance of the SUBJECT PROPERTY.
During the drive-by surveillance, I observed the SUBJECT VEHICLE parked in front of the
garage on the SUBJECT PROPERTY.  I also observed what appeared to be an opaque cover
over one of the front windows located on the second story of the residence.  Based on my
training and experience, I am aware that is common for individuals engaged in the manufacturer
of marijuana to use opaque covers over windows as a means to conceal the light emanating from
lights utilized to grow marijuana indoors.

## C. *PG&E Records for SUBJECT PROPERTY*

33.     During the course of this investigation, I obtained PG&E utility records for the SUBJECT
PROPERTY.  The PG&E records showed FRICCERO as the current subscriber to electrical and
gas service at the SUBJECT PROPERTY with a start date of November 9, 2017.  Furthermore,
the PG&E utility records provided telephone number (907) 299-7936 for FRICCERO.  A review
of the monthly usage records showed periods of excessive electrical which based on my training
and experience is an indicator of an indoor marijuana grow operation.  The following is table of
the electrical usage in kilowatt hours (kwh) and billing amounts for the SUBJECT PROPERTY
from May 2018 through December 2018.

| Date | Usage | Billing Amount |
| --- | --- | --- |
| May 2018 | 1,679.73 kwh | $433.13 |
| June 2018 | 3,277.52 kwh | $1,085.86 |
| July 2018 | 5,225.71 kwh | $1,908.45 |
| Aug. 2018 | 4,553.12 kwh | $1,639.12 |
| Sept. 2018 | 3,002.89 kwh | $956.16 |
| Oct. 2018 | 1,801.75 kwh | $479.47 |
| Nov. 2018 | 1,550.03 kwh | $385.73 |
| Dec. 2018 | 1,563.72 kwh | $393.09 |

14

34.     For comparison purposes, I reviewed the electrical usage records for the previous PG&E subscriber of the SUBJECT PROPERTY from May 2017 through October 2017. The average monthly electrical usage for the referenced time period was approximately 1,157 kwh and the average monthly billing amount was approximately $283. For the same time period, FRICCERO's monthly average usage was approximately 3,257 kwh and the average billing amount was approximately $1,083.

### D. *AT&T Records for Telephone Number (907) 299-7936*

35.     The carrier for telephone number (907) 299-7936 was identified as AT&T. According to records from AT&T, telephone number (907) 299-7936 is subscribed to Eric FRICCERO with a service start date of September 9, 2010. Additionally, the toll records revealed that FRICCERO had been in contact with telephone number (530) 414-9624 on 239 occasions from July 23, 2018 through September 20, 2018. An open source Internet query on telephone number (530) 414-9624 returned a website for Emerald Bay Extracts. I conducted a review of the Emerald Bay Extracts website and located telephone number (530) 414-9624 listed as the contact telephone number for the business. As previously discussed in paragraph 24, the suspected THC vials that were found inside Detained Parcel #1 were branded Emerald Bay Extracts.

### E. *Woodland Police Department Records*

36.     I obtained a Woodland Police Department report involving a November 24, 2015 incident where FRICCERO reported that he was a victim of a robbery of four pounds of marijuana. According to the police report, FRICCERO admitted to police that he was a marijuana grower and was engaged in selling marijuana over the Internet. Specifically, FRICCERO told police he had posted an advertisement on website budtrader.com seeking to sell marijuana for $1,600 per pound. FRICCERO met with four individuals at a Walmart in Woodland, California, with the intention of selling the marijuana to the individuals for cash. Instead, the individuals took the marijuana from FRICCERO and fled the scene.

15

## VI.    METHODS AND MEANS OF USING THE UNITED STATES MAIL

37.    Based on my experience, training, and discussions with other law enforcement officers experienced in drug investigations, I know that certain indicators exist when persons use the United States Mail to ship controlled substances from one location to another.  Indicators for parcels that contain controlled substances and/or proceeds from controlled substances include, but are not limited to, the following:

a.  It is common practice for shippers of the controlled substances to use Express Mail and Priority Mail because the drugs arrive at the destination more quickly and on a predictable date.  Express Mail and Priority Mail, when paired with a special service such as delivery confirmation, allow traffickers to monitor the progress of the shipment of controlled substances.  Traffickers pay for the benefit of being able to confirm the delivery of the parcel by checking the Postal Service Internet website and/or calling the local post office.

b.  Packages containing controlled substances or proceeds have, in many instances, a fictitious return address, incomplete return address, no return address, a return address that is the same as the addressee address, or a return address that does not match the place from which the parcel was mailed.  These packages are also sometimes addressed to or from a commercial mail receiving agency (*e.g.*, Mail Boxes Etc.).  A shipper may also mail the parcel containing controlled substances from an area different from the return address on the parcel because: (1) the return address is fictitious or (2) the shipper is attempting to conceal the actual location from which the parcel was mailed.  These practices are used by narcotics traffickers to hide from law enforcement officials the true identity of the persons shipping and/or receiving the controlled substances or proceeds.

c.  Individuals involved in the trafficking of controlled substances through the United States Mail will send and receive Express or Priority mailings on a more frequent basis than a normal postal customer.  Drug traffickers use Express Mail and Priority Mail at a higher

rate due to their frequent exchanges of controlled substances and the proceeds from the sale of these controlled substances.

d. In order to conceal the distinctive smell of controlled substances from narcotics detection dogs, these packages tend to be wrapped excessively in bubble-pack and wrapping plastic, and are sometimes sealed with the use of tape around all seams. In addition, the parcels often contain other smaller parcels which are carefully sealed to prevent the escape of odors. Perfumes, coffee, dryer sheets, tobacco, or other substances with strong odors are also sometimes used to mask the odor of the controlled substances being shipped. Drug traffickers often use heat/vacuum sealed plastic bags, and/or re-sealed cans in an attempt to prevent the escape of orders.

e. California is typically a source state for drugs, especially marijuana. It is common for individuals in California to manufacture marijuana, to mail parcels containing narcotics to other states and then receive mail parcels containing cash payments in return.

38. Based on my training and experience and discussions with other law enforcement officers, I know that parcels shipped by drug traffickers sometimes contain information and documentation related to the sales and distribution of controlled substances. The documentation can include, but is not limited to, information and instructions on the breakdown and distribution of the controlled substances at the destination; information on the use and effects of the various controlled substances; information about the actual sender; pay/owe sheets; and information and instructions for ordering future controlled substances.

39. Drug traffickers who use the United States Mail and other carriers as a means of distributing controlled substances, paraphernalia, and proceeds, and as a means of communicating with co-conspirators often include the following in parcels relating to their trafficking activity, all of which are evidence, fruits, proceeds, and/or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 843(b), and 846:

a. Controlled substances, including heroin, cocaine, methamphetamine, and marijuana.

17

b.    Packaging, baggies, and cutting agents, including items used to conceal the odor of narcotics, such as perfumes, coffee, dryer sheets, tobacco, or other substances with a strong odor.

c.    Records reflecting the mailing or receipt of packages through Express Mail, Priority Mail, Federal Express, UPS or any other common carrier.

d.    United States and foreign currency, securities, precious metals, jewelry, stocks, bonds, in amounts exceeding $500, including financial records related to the laundering of illicitly obtained monies and/or other forms of assets, including United States currency acquired through the sales, trafficking, or distribution of controlled substances.

e.    Records reflecting or relating to the transporting, ordering, purchasing, and/or distribution of controlled substances, including but not limited to books, receipts, notes, ledgers, pay and owe sheets, correspondence, records noting price, quantity, date and/or times when controlled substances were purchased, possessed, transferred, distributed, sold or concealed.

f.    Records reflecting or relating to co-conspirators, including but not limited to personal notes, correspondence, cables, telegrams, personal address lists, listings of telephone numbers, and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates and conspirators in controlled substance trafficking activities.

g.    Indicia or other forms of evidence showing dominion and control, or ownership of mail parcels, locations, vehicles, storage areas, safes, lock boxes, and/or containers related to the storage of controlled substances or proceeds.

## VII.    SEARCH OF DIGITAL INFORMATION

40.    Your affiant is aware that users and vendors of online black markets use a computer to access the dark web where online black markets are located.  Your affiant is also aware that individuals must use an electronic device to locate and communicate with bitcoin exchangers and purchase bitcoins.  Users have to establish an account on an online black market's website to purchase goods and also establish accounts to initiate initial trades with bitcoin exchangers.  Users also must establish electronic wallets to receive and send bitcoins to purchase drugs.  These wallets are electronic in nature and may be stored on mobile devices (phones or tablets), external or removable media, and/or computers.  Your affiant is aware that once contact is made with a bitcoin exchanger on a digital currency exchange platform such as localbitcoins.com, all subsequent contact and transactions can be conducted from one phone to the other during a face to face transaction, exchanging currency for bitcoins.  Your affiant is also aware that users can back-up wallets to paper printouts that would contain information to restore the wallet in an electronic form (cold storage).  Passwords for access to online black markets, as well as for electronic wallets, are typically complex and are often written down or saved in an accessible manner on paper or on some electronic device. Your affiant believes that these are located in the SUBJECT PROPERTY, SUBJECT VEHICLE and on the person of FRICCERO.

41.    As described above and in Attachment B, your affiant submits that computers, smart phones, and possibly other storage media will be found within the SUBJECT RESIDENCE, SUBJECT VEHICLE and on the person of FRICCERO and there is probable cause to search and seize those items for the reasons stated below.  Some of these electronic records might take the form of files, documents, and other data that is user-generated.  Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.  Furthermore, your affiant submits that sufficient probable cause has been established to search and seize any online black-market vendor accounts, online digital currency exchange platform accounts, and the data contained therein.  Due to the inherent illicit and anonymous nature of these accounts, and that there is no identified service provider for these accounts, legitimate, compliant or not, to which legal process may be served; your affiant believes this to be the only . manner to recover said evidence.

19

42.     For example, based on my knowledge, training, and experience, your affiant is aware that a powered-on computer maintains volatile data. Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks (floppy, tape and/or CD-ROM), and printing activity. Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed. Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

43.     Based on my knowledge, training, and experience, your affiant knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little to no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

44.     Also, again based on your affiant's training and experience, wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide

20

evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

45.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

46.     Thus, the forensic analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

47.     In cases of this sort, laptop computers and/or smartphones are also used as instrumentalities of the crime to commit offenses involving interstate drug sales and movement of drug proceeds. Devices such as modems and routers can contain information about dates, frequency, and computer(s) used to access the Internet. The laptop or smart phone may also have fingerprints on them indicating the user of the computer and its components.

48.     Similarly, files related to the purchasing and selling of controlled substances, as well as, the movement of currency found on computers and other digital communications devices are

21

usually obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the data, search terms used, exchange, transfer, distribution, possession or origin of the files. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary internet directory or "cache". The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed internet pages or if a user takes steps to delete them. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

49.     "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. Your affiant knows from training and experience and discussions with other law enforcement officers that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of internet connection at the residence.

50.     Searching the computer(s) for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or internet use is located in various operating system log files that are not easily located or reviewed. In addition, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a

search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this location (the computer) for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

51.     Based upon knowledge, training and experience, your affiant knows that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

52.     The nature of evidence: As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

53.     The volume of evidence and time required for an examination: Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much

time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

54.     Technical requirements: Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off- site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

55.     Variety of forms of electronic media:  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

56.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to, computer-assisted scans of the entire medium that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## VIII.   **REQUEST FOR SEALING**

57.     Finally, your affiant respectfully requests that this Court issue an order restricting, until further order of the Court, this case, to include, the Application and Search Warrant. I believe that restricting these documents are necessary to protect the identity of cooperating individuals,

24

because the items and information to be seized are relevant to an ongoing investigation into a criminal organization, and not all of the targets of this investigation will be searched at this time. Based upon my training and experience, your affiant has learned that online criminals actively search for criminal Affidavits and Search Warrants via the Internet and disseminate them to others actively seeking out information over the Web and other sources concerning law enforcement activity in this arena. Accordingly, premature disclosure of the contents of this Affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## IX. CONCLUSION

58.     Based on the facts set forth in this Affidavit, I believe there is probable cause that evidence, fruits, proceeds, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Manufacture or Distribution of a Controlled Substance), and 21 U.S.C. § 846 (Conspiracy to Manufacture, to Distribute, and to Possess with Intent to Distribute a Controlled Substance) are concealed in the locations identified in Attachment A-1 and A-2. Accordingly, I respectfully request the issuance of a search warrant authorizing the search of the locations described in Attachments A-1 and A-2, as well as the items described in Attachment B.

59.     I also request that any vehicles to be searched that are under the control of the occupants of the locations to be searched at the time these warrants are served, as evidenced by Department of Motor Vehicle registration information, possession of keys to the vehicle, observations of the utilization of those vehicle by the occupants, and witness statements or admissions. Based on my training and experience, and through interaction with other experienced law enforcement officers, I know that drug traffickers commonly transport and store the evidentiary items listed in Attachment B in their vehicles. I also know that these vehicles are not commonly registered to the person who has control over them.

60.     I request that all bulk marijuana seized during execution of the search warrants be disposed of, except for representative samples taken in accordance with standard DEA policy and procedures.

25

61.     Furthermore, I believe that there is probable cause that ERIC WILLIAM JOHN
FRICCERO committed those same crimes, thus supporting the legal basis for the Court to issue
an arrest warrant based on a criminal complaint.

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best
of my knowledge, information, and belief.

Jason Chin
Special Agent
Drug Enforcement Administration

Sworn and Subscribed to me on January 2⁹, 2019

The Honorable Kendall J. Newman
United States Magistrate Judge

Approved as to form:

/s/GRANT B. RABENN
Grant B. Rabenn
Assistant U.S. Attorney

26

**ATTACHMENT A-1**

**LOCATION TO BE SEARCHED**

**6587 Hahn Road, Arbuckle, California (SUBJECT PROPERTY)**

A rural residential property containing a single family residence with a white colored exterior and multiple outbuildings. The address numbers "6587" are listed on a blue colored sign that is posted on a fence at the front of the property. The property is located on the north side of Hahn Road. The property to be searched is depicted in the recent photographs below.





The place to be searched includes all rooms, attics, basements, and all other parts therein, and surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the SUBJECT PROPERTY; any computer, digital devices, and digital media located therein, where the items specified in Attachment B may be found; all vehicles located at the SUBJECT PROPERTY which fall under the dominion and control of the person or persons associated with the SUBJECT PROPERTY; and all internal and external compartments and all containers that may be associated with the storage of controlled substances or the proceeds of the sales of controlled substances or their instrumentalities contained within the aforementioned places or vehicles.

## ATTACHMENT B
## ITEMS TO BE SEIZED

The following records, documents, files, or materials, in whatever form, including handmade or mechanical form (such as printed, written, handwritten, or typed); photocopies or other photographic form; and electrical, electronic, and magnetic form (such as computers, hard drives, flash drives, tapes, cassettes, hard disks, floppy disks, diskettes, compact discs, CD-ROMs, DVDs, optical discs, Zip cartridges, printer buffers, smart cards, or electronic notebooks, or any other electronic storage medium) that constitute or contain evidence, instrumentalities, or fruits of violations of 21 U.S.C. § 841(a)(1) (Manufacture or Distribution of a Controlled Substance); 21 U.S.C. § 846 (Conspiracy to Manufacture, to Distribute, and to Possess with Intent to Distribute a Controlled Substance).

1.     All records relating to the violations described above, including:

    a.     any and all documents, records or information relating to the purchase, sale, importation, possession, shipment, tracking, delivery or distribution of controlled substances;

    b.     any and all documents, records or information relating to the purchase, sale, importation, possession, shipment, tracking, delivery or distribution of packaging materials;

    c.     any and all documents, records or information relating to the purchase, sale, tracking, delivery or distribution of postage or express mail consignment;

    d.     any and all documents, records or information relating to the transfer, purchase, sale or disposition of virtual currency;

    e.     any and all documents, records, or information relating to the access, creation and maintenance of websites and hidden (Tor-based) services;

f.      any and all documents, records, or information relating to email accounts used in furtherance of these offenses;

g.      any and all records or other items which are evidence of ownership or use of computer equipment, including, but not limited to, sales receipts, bills for internet access, handwritten notes and handwritten notes in computer manuals.

h.      any and all records relating to indicia of occupancy, residency, and ownership or use of the SUBJECT PROPERTY and SUBJECT VEHICLE, including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, identification documents, and keys;

i.      any and all records of any address and/or telephone books, rolodex indicia, electronic organizers, telephone paging devices and the memory thereof, and any papers, records or electronic data reflecting names, addresses, telephone numbers, pager numbers of co-conspirators, sources of controlled substances and/or virtual currency, identifying information for customers purchasing controlled substances and/or virtual currency;

j.      all bank records, checks, credit card bills, account information, safe deposit box information and other financial records;

k.      all copies of income tax returns filed with the Internal Revenue Service (IRS) or the California Franchise Tax Board;

l.      all records related to the purchase of real estate or other assets, or the leasing of storage units,

m.      financial records for  including foreign and domestic banking records, ledger books, wire transfer instructions, and receipts for wire transfers,

n.      bulk cash in excess of $2,000.

2. Any digital devices or other electronic storage media and/or their components used as a means to commit the violations described above, including:

a. any digital device or other electronic storage media capable of being used to commit, further, or store evidence or fruits of the offenses listed above;

b. any digital devices or other electronic storage media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, cameras, printers, plotters, encryption devices, and optical scanners;

c. any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d. any documentation, operating logs and reference manuals regarding the operation of the digital device or other electronic storage media or software;

e. any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

f. any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g. any passwords, password files, seed words, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

3.      For any digital device or other electronic storage media upon which electronically stored information that is called for by this warrant may be contained, or that may contain things otherwise called for by this warrant:

a.      evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.      evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the lack of such malicious software;

d.      evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

e.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

f.      evidence of the times the digital device or other electronic storage media was used;

g.      passwords, encryption keys, seed words, and other access devices that may be necessary to access the digital device or other electronic storage media;

h.      documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the digital device or other electronic storage media;

i.      contextual information necessary to understand the evidence described in this attachment.

4.      Records and things evidencing the use of an Internet Protocol (IP) address to communicate with the internet, including:

a.      routers, modems, and network equipment used to connect computers to the internet;

b.      records of Internet Protocol addresses used;

c.      records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses.

5.      Any and all hidden services accounts or encrypted chat applications used in furtherance of the offenses described above, including, but not limited to, darknet market accounts, associated darknet forum accounts, Tor-based email accounts, and Wickr handles and logins.

6.      Any and all peer to peer (P2P) virtual currency trading platform accounts, with no legitimate or identified service provider to which legal process may be served, used in furtherance of the offenses described above, including, but not limited to, localbitcoins.com accounts or bitcoin-otc internet relay chat channel accounts.

7.      Virtual currency in any format, including but not limited to, wallets (digital and paper), seed words, usernames and passwords, public keys (addresses) and private keys.

8. Fiat currency (U.S. dollars or other government issued currency).

9. Keys to storage units, suites, lockers and safe deposit boxes.

10. Firearms or other prohibited weapons that are not registered to ERIC WILLIAM JOHN FRICCERO or his cohabitants.

11. Controlled substances, associated paraphernalia and/or contraband, and any equipment or devices used in the manufacturing, storage and processing of controlled substances.

THE SEIZURE OF DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS SPECIFICALLY AUTHORIZED BY THIS SEARCH WARRANT, NOT ONLY TO THE EXTENT THAT SUCH DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA CONSTITUTE INSTRUMENTALITIES OF THE CRIMINAL ACTIVITY DESCRIBED ABOVE, BUT ALSO FOR THE PURPOSE OF CONDUCTING OFF-SITE EXAMINATIONS OF THEIR CONTENTS FOR EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED CRIME.

## UNITED STATES DISTRICT COURT
## SEALED
for the
Eastern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| 6587 Hahn Road | ) Case No. 2:19-SW-0072  KJN |
| Arbuckle, California | ) |
| | ) |

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the            Eastern            District of            California
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-1, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before    Feb 12, 2019    *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern
District of California.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    Jan 29 2019   10:25 A.M.    _____
                                                                                *Judge's signature*

City and state:        Sacramento, California                    Kendall J. Newman, U.S. Magistrate Judge
                                                                                *Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.


_____                    _____
Signature of Judge                                                                    Date

## ATTACHMENT A-1
## <u>LOCATION TO BE SEARCHED</u>

### 6587 Hahn Road, Arbuckle, California (SUBJECT PROPERTY)

A rural residential property containing a single family residence with a white colored exterior and multiple outbuildings. The address numbers "6587" are listed on a blue colored sign that is posted on a fence at the front of the property. The property is located on the north side of Hahn Road. The property to be searched is depicted in the recent photographs below.





The place to be searched includes all rooms, attics, basements, and all other parts therein, and surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the SUBJECT PROPERTY; any computer, digital devices, and digital media located therein, where the items specified in Attachment B may be found; all vehicles located at the SUBJECT PROPERTY which fall under the dominion and control of the person or persons associated with the SUBJECT PROPERTY; and all internal and external compartments and all containers that may be associated with the storage of controlled substances or the proceeds of the sales of controlled substances or their instrumentalities contained within the aforementioned places or vehicles.

## ATTACHMENT B
## ITEMS TO BE SEIZED

The following records, documents, files, or materials, in whatever form, including handmade or mechanical form (such as printed, written, handwritten, or typed); photocopies or other photographic form; and electrical, electronic, and magnetic form (such as computers, hard drives, flash drives, tapes, cassettes, hard disks, floppy disks, diskettes, compact discs, CD-ROMs, DVDs, optical discs, Zip cartridges, printer buffers, smart cards, or electronic notebooks, or any other electronic storage medium) that constitute or contain evidence, instrumentalities, or fruits of violations of 21 U.S.C. § 841(a)(1) (Manufacture or Distribution of a Controlled Substance); 21 U.S.C. § 846 (Conspiracy to Manufacture, to Distribute, and to Possess with Intent to Distribute a Controlled Substance).

1.     All records relating to the violations described above, including:

a.     any and all documents, records or information relating to the purchase, sale, importation, possession, shipment, tracking, delivery or distribution of controlled substances;

b.     any and all documents, records or information relating to the purchase, sale, importation, possession, shipment, tracking, delivery or distribution of packaging materials;

c.     any and all documents, records or information relating to the purchase, sale, tracking, delivery or distribution of postage or express mail consignment;

d.     any and all documents, records or information relating to the transfer, purchase, sale or disposition of virtual currency;

e.     any and all documents, records, or information relating to the access, creation and maintenance of websites and hidden (Tor-based) services;

f.      any and all documents, records, or information relating to email accounts used in furtherance of these offenses;

g.      any and all records or other items which are evidence of ownership or use of computer equipment, including, but not limited to, sales receipts, bills for internet access, handwritten notes and handwritten notes in computer manuals.

h.      any and all records relating to indicia of occupancy, residency, and ownership or use of the SUBJECT PROPERTY and SUBJECT VEHICLE, including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, identification documents, and keys;

i.      any and all records of any address and/or telephone books, rolodex indicia, electronic organizers, telephone paging devices and the memory thereof, and any papers, records or electronic data reflecting names, addresses, telephone numbers, pager numbers of co-conspirators, sources of controlled substances and/or virtual currency, identifying information for customers purchasing controlled substances and/or virtual currency;

j.      all bank records, checks, credit card bills, account information, safe deposit box information and other financial records;

k.      all copies of income tax returns filed with the Internal Revenue Service (IRS) or the California Franchise Tax Board;

l.      all records related to the purchase of real estate or other assets, or the leasing of storage units,

m.      financial records for including foreign and domestic banking records, ledger books, wire transfer instructions, and receipts for wire transfers,

n.      bulk cash in excess of $2,000.

2.      Any digital devices or other electronic storage media and/or their components used as a means to commit the violations described above, including:

a.      any digital device or other electronic storage media capable of being used to commit, further, or store evidence or fruits of the offenses listed above;

b.      any digital devices or other electronic storage media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, cameras, printers, plotters, encryption devices, and optical scanners;

c.      any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d.      any documentation, operating logs and reference manuals regarding the operation of the digital device or other electronic storage media or software;

e.      any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

f.      any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g.      any passwords, password files, seed words, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

3.      For any digital device or other electronic storage media upon which electronically stored information that is called for by this warrant may be contained, or that may contain things otherwise called for by this warrant:

        a.      evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

        b.      evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        c.      evidence of the lack of such malicious software;

        d.      evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

        e.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

        f.      evidence of the times the digital device or other electronic storage media was used;

        g.      passwords, encryption keys, seed words, and other access devices that may be necessary to access the digital device or other electronic storage media;

h.      documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the digital device or other electronic storage media;

i.      contextual information necessary to understand the evidence described in this attachment.

4.      Records and things evidencing the use of an Internet Protocol (IP) address to communicate with the internet, including:

a.      routers, modems, and network equipment used to connect computers to the internet;

b.      records of Internet Protocol addresses used;

c.      records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses.

5.      Any and all hidden services accounts or encrypted chat applications used in furtherance of the offenses described above, including, but not limited to, darknet market accounts, associated darknet forum accounts, Tor-based email accounts, and Wickr handles and logins.

6.      Any and all peer to peer (P2P) virtual currency trading platform accounts, with no legitimate or identified service provider to which legal process may be served, used in furtherance of the offenses described above, including, but not limited to, localbitcoins.com accounts or bitcoin-otc internet relay chat channel accounts.

7.      Virtual currency in any format, including but not limited to, wallets (digital and paper), seed words, usernames and passwords, public keys (addresses) and private keys.

8.    Fiat currency (U.S. dollars or other government issued currency).

9.    Keys to storage units, suites, lockers and safe deposit boxes.

10.    Firearms or other prohibited weapons that are not registered to ERIC WILLIAM JOHN FRICCERO or his cohabitants.

11.    Controlled substances, associated paraphernalia and/or contraband, and any equipment or devices used in the manufacturing, storage and processing of controlled substances.

THE SEIZURE OF DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS SPECIFICALLY AUTHORIZED BY THIS SEARCH WARRANT, NOT ONLY TO THE EXTENT THAT SUCH DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA CONSTITUTE INSTRUMENTALITIES OF THE CRIMINAL ACTIVITY DESCRIBED ABOVE, BUT ALSO FOR THE PURPOSE OF CONDUCTING OFF-SITE EXAMINATIONS OF THEIR CONTENTS FOR EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED CRIME.